# Exhibit A

```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2     _____

 3     J.B.B.C., A MINOR CHILD, by     ) Civil Action
       and through his father and      ) No. 1:20-cv-01509-CJN
 4     Next Friend, Carlos Emilio      )
       Barrera Rodriguez,              )
 5                                     )
                         Plaintiff,    )
 6                                     ) Telephonic Motion
       vs.                             ) Hearing
 7                                     )
       CHAD F. WOLF, Acting            )
 8     Secretary of Homeland           )
       Security, in his official       )
 9     capacity, et al.,               ) Washington, D.C.
                                       ) June 24, 2020
10                       Defendants.   ) Time:  10:00 a.m.

11     _____

                 Transcript of Telephonic Motion Hearing
12                            Held Before
             The Honorable Carl J. Nichols (via telephone)
13                     United States District Judge

14     _____

                      A P P E A R A N C E S
15
       For the Plaintiff:        Lee Gelernt
16     (via telephone)           AMERICAN CIVIL LIBERTIES
                                 UNION FOUNDATION
17                               125 Broad Street, 18th Floor
                                 New York, New York 10004
18                               lgelernt@aclu.org

19                               Jamie L. Crook
                                 CENTER FOR GENDER AND REFUGEE STUDIES
20                               200 McAllister Street,
                                 San Francisco, California 94102
21                               crookjamie@uchastings.edu

22                               Stephen B. Kang
                                 Cody H. Wofsy
23                               AMERICAN CIVIL LIBERTIES
                                 UNION FOUNDATION
24                               Immigrants' Rights Project
                                 39 Drumm Street
25                               San Francisco, California 94111
                                 skang@aclu.org
```

```
 1      For the Plaintiff, continued:
        (via telephone)          Arthur B. Spitzer
 2                               AMERICAN CIVIL LIBERTIES UNION
                                 OF THE DISTRICT OF COLUMBIA
 3                               915 15th Street, Northwest, 2nd Floor
                                 Washington, D.C. 20005
 4                               artspitzer@gmail.com

 5      For the Defendants:      Jean Lin
        (via telephone)          Erez Reuveni
 6                               U.S. DEPARTMENT OF JUSTICE
                                 Civil Division, Federal Programs Branch
 7                               1100 L Street, Northwest, Room 11532
                                 Washington, D.C. 20005
 8                               jean.lin@usdoj.gov

 9      _____

        Stenographic Official Court Reporter:
10      (via telephone)          Nancy J. Meyer
                                 Registered Diplomate Reporter
11                               Certified Realtime Reporter
                                 United States Courthouse, Room 6509
12                               333 Constitution Avenue, Northwest
                                 Washington, D.C. 20001
13                               (202) 354-3118

14

15

16

17

18

19

20

21

22

23

24

25
```

1        P R O C E E D I N G S

2            (REPORTER'S NOTE:  This hearing was held during the
   COVID-19 pandemic stay-at-home restrictions and is subject to
3   the limitations of technology associated with the use of
   technology, including but not limited to telephone and video
4   signal interference, static, signal interruptions, and other
   restrictions and limitations associated with remote court
5   reporting via telephone, speakerphone, and/or
   videoconferencing.)

6

7            THE COURT:  Good morning.  This is Judge Nichols.

8   Ms. Lesley, could you please call this matter.

9            THE COURTROOM DEPUTY:  Good morning, Judge.  Yes,

10   sir.

11        This is Civil Case Year 2020-1509, J.B.B.C. v. Chad F.

12   Wolf, et al.; movant:  Scholars of Refugee and Immigration Law;

13   amicus:  International Refugee Assistance Project.

14        Counsel, please introduce yourselves for the record,

15   beginning with the plaintiffs.

16            MR. GELERNT:  This is Lee Gelernt from the ACLU for

17   plaintiffs.

18            THE COURT:  Mr. Gelernt, good morning.

19            MR. GELERNT:  Good morning, Your Honor.

20            MR. WOFSY:  Good morning.  This is Cody Wofsy, also

21   from the ACLU, for plaintiff.

22            THE COURT:  Good morning.

23            MR. KANG:  Good morning.  This is Stephen Kang from

24   the ACLU for plaintiffs.

25            THE COURT:  Mr. Kang.

1          MS. CROOK:  Good morning.  This is Jamie Crook from

2     the Center for Gender and Refugee Studies for plaintiff.

3          THE COURT:  Ms. Crook, good morning.

4          MS. LIN:  Good morning.  This is Jean Lin for the

5     government, and with me is Erez Reuveni.

6          THE COURT:  Ms. Lin, good morning.

7          MS. LIN:  Good morning.

8          MR. REUVENI:  Good morning, Your Honor.

9          THE COURT:  Good morning.

10     Is there anyone else representing any of the parties who

11     would like to state an appearance.

12          MR. SPITZER:  Yes, Your Honor.  This is

13     Arthur Spitzer from the ACLU of D.C. for the plaintiffs.

14          THE COURT:  Mr. Spitzer, good morning.  Anyone else?

15     Okay.  So we're obviously here on the plaintiff's

16     motion.  Mr. Gelernt, are you going to take the lead this

17     morning for plaintiff?

18          MR. GELERNT:  I will, Your Honor.

19          THE COURT:  Let me start with you then.  And here --

20     let me back up for a second.  Here's -- here's how I intend to

21     conduct this hearing.  I'd like to hear from plaintiff's

22     counsel to start.  We'll then hear from the government.  We'll

23     hear briefly, I hope, from plaintiff again in rebuttal, and the

24     government -- I will give the opportunity to the government to

25     have a short surrebuttal, if it so chooses.

1        I intend to conduct this very much like an oral argument

2    if we were all in the courtroom together.  I recognize there

3    are obvious technological limitations that we have here.  In

4    the event that there's a -- someone gets disconnected or it's

5    difficult to hear someone, we'll just pause and -- and note

6    that and rewind as necessary.

7        And for the court reporter, I would ask that any time

8    someone new begins speaking, if the person who begins speaking

9    could state his or her name so that the court reporter knows

10    who's speaking; that would be very helpful.

11        So with that, Mr. Gelernt, please go ahead.

12        I -- I should also say that I have read all of the

13    papers, including the sealed declarations.  So I am quite

14    familiar with -- I should say and also to include the amicus

15    briefs.  I'm quite familiar with the arguments that have been

16    made and the facts.  So with that, why don't you go ahead and

17    start and present your argument for why I should, I think,

18    extend the stay of removal or return beyond today.

19        MR. GELERNT:  Thank you, Your Honor.  This is

20    Mr. Gelernt.

21        There are, obviously, as the Court knows, two basic

22    prongs to this.  There is the merit, and then there is the

23    balance of harms and equities.  With the Court's permission,

24    I'd like to start with the merits.

25        THE COURT:  Please do.

1          MR. GELERNT:  On the merits -- on the merits we have

2     three arguments.  The first is, of course, that section 265

3     does not authorize the expulsion of any individual.  The second

4     is even assuming that section 265 does authorize the expulsion

5     of some individuals, it needs to be read in conjunction with

6     the child protection and asylum protection statutes, and at

7     least for children seeking protection, they cannot be expelled

8     without the procedures afforded by Congress in The Immigration

9     Act, and the full argument is that this is -- that the rule is

10    arbitrary and capricious under the APA.  And I'd like to start

11    with the 265 argument and why it doesn't authorize expulsions.

12         The government recognizes, of course, that 265 doesn't

13    state that the government may expel someone.  So they're asking

14    for an implied power.  That's an enormous power to expel

15    someone.  We are not aware of any time in the history of the

16    country where the government's power to deport someone has not

17    been stated expressly, and, of course, it's always been in

18    The Immigration Act.  Beyond that, of course, the government's

19    argument has enormous implications, because, as the government

20    recognizes, the statute doesn't, on its face, differentiate

21    between citizens and noncitizens.

22         And while the government has only exercised their power

23    in the regulation at this point as to noncitizens, the

24    question, of course, is what the statute authorizes.  So if the

25    statute were read to provide for expulsions, it would

1    necessarily have to provide for expulsions of citizens, and I

2    think it -- it's inconceivable that Congress was saying the

3    government can actually expel a United States citizen without

4    any procedure.  Not only would it be unconstitutional, but

5    for Congress has -- not only has taken that step but it does so

6    with -- with implicit authority; I think it is inconceivable.

7           THE COURT:  Mr. Gelernt, your brief either argues or

8    suggests that the -- that 265 is a grant of authority to the

9    Surgeon General/CDC director to prohibit third parties, like

10    transportation companies, from bringing persons or property to

11    the United States.  You believe that the director of the CDC

12    could not have -- or could not, consistent with 265, prohibit

13    the entry of persons through Mexico in any manner, including if

14    an alien attempted to walk across the border and the CDC

15    director was concerned, for example -- just to use a

16    differentiate hypothetical -- about an Ebola outbreak in

17    Mexico, could the CDC director not say all entry is prohibited

18    in any fashion?

19           MR. GELERNT:  So, Your Honor, we do not believe that

20    it would authorize expulsions, but what could be barred are

21    entries of third parties.  But I think what -- what I would --

22    I want to address Your Honor's question where -- I think

23    getting to the central point is what would happen in that

24    situation is if the individual walked over the border, he could

25    be arrested.  CDC could authorize quarantines.  There could be

1    potentially criminal penalties and fines, and then he could be

2    expelled pursuant to the immigration laws.

3         We -- we are simply saying that the 265 provision itself

4    does not authorize expulsions and Congress did not intend to do

5    that because it was fixing a very specific problem and it

6    recognized that the immigration laws were there running

7    parallel.  And if someone was going to be deported, they would

8    be deported through the mechanism of the immigration laws that

9    provided whatever procedural protections Congress believes were

10   necessary, but that 265 itself would not bar expulsion.  So

11   they could bar entry of -- and the government has another

12   provision, 212(f) of The Immigration Act, which does allow the

13   barring of entry, but 265 itself would not allow the

14   expulsions.

15        If the individual insisted on walking across the

16   country, he would be arrested, potentially quarantined, and

17   subject to immigration.  So it's not as if the government can't

18   remove them.  What -- what 265 did not set up is a parallel

19   deportation process.  The government can remove people, but it

20   would be according to the immigration laws.

21             THE COURT:  So I understand that is your argument,

22   but I'm trying to understand, first, what power section 265 of

23   Title 42 does confer, and it seems to me that your brief argues

24   that the power is limited to -- because of the use of the term

25   "introduction," that the power is limited to prohibiting third

1    parties from bringing to the United States persons from

2    countries, you know, assuming that there are the -- the

3    appropriate reasons to do so.  And my question is would -- if

4    that's right, then wouldn't that mean that the CDC director

5    actually lacks the authority to prohibit persons from entering

6    from another country who aren't being transported by third

7    parties?

8                 MR. GELERNT:  Yes, Your Honor.  And I apologize if I

9    didn't answer that really.  That's correct under our broadest

10   theory, that it regulated third parties; that Congress was

11   looking at a very specific problem from Europe with cholera,

12   thought this was the proper fix, and didn't authorize 265 to go

13   beyond third parties.  And I -- I -- so that -- that is our

14   argument, Your Honor.

15        And in the legislative history, as we've pointed out,

16   Senator Harris, who was particularly involved in the

17   legislation, one of the co-sponsors, actually made a point of

18   saying there are other acts that deal with, quote/unquote, land

19   crossings.  And so what -- what -- the legislative history, I

20   think the text and context shows very clearly, is that it was

21   directed at third parties.  And I -- I was simply making the

22   point that the government would not, of course, be unable to

23   deal with someone who walked across the border.  There are all

24   sorts of powers.

25        And they can, in fact, use 212(f) as a power to bar

1    entry.  I think the reason that the government has not used

2    212(f) in this context is because the immigration laws are very

3    clear that they don't -- even someone with a communicable

4    disease can still apply for asylum, and especially a child.

5    And so they're trying to use this power that's never before

6    been used to bar expulsions throughout history:  Spanish flu,

7    meningitis.  And the government says it's never been used, but

8    the truth is it has been used.  It's just never been -- against

9    persons.  It's just never been used for expulsions, and I think

10   ultimately what -- what the government's argument comes down

11   to -- and I think Your Honor put his finger on it, without a

12   question, is the government's saying, well, we must have to

13   have that power because we think it's necessary.

14        And that's, of course, as Your Honor knows, not the way

15   legislation works.  I think the *D.C. v. DOL*, D.C. Circuit case,

16   that -- that then Judge Kavanaugh wrote, I think specifically

17   addresses that Congress sometimes picks specific means, and

18   even if people think the statute might need to be updated or

19   need other powers, the courts cannot update a statute or

20   rewrite it.  But, again, I do think the government has

21   significant powers with respect to individuals.  And with

22   children in particular, Congress has gone out of their way to

23   make clear that you cannot just expel a child summarily.

24        And so what -- what we believe is that the government

25   has not actually offered an interpretation of 265's text,

1     context, structure, or history and that -- their argument

2     reduces to Congress must have given us this power because we

3     think we need it.  And, of course, again, that's not the way

4     legislation works.  There is very specific evidence that

5     Congress was focusing on third parties in 1893, and the

6     government concedes that when the provision was recodified in

7     1944, it wasn't changed substantively, and, in fact, the

8     wording is virtually identical.

9          But beyond that 265 argument --

10         (Indiscernible simultaneous cross-talk.)

11         THE COURT:  Mr. Gelernt --

12         MR. GELERNT:  I'm sorry, Your Honor.

13         THE COURT:  -- is a different version of it -- or

14    maybe it's the same argument -- but a different argument is

15    that "introduction" is potentially an ambiguous term.  We are

16    entitled to some form of deference in interpreting

17    "introduction."  Introduction could be the bringing by a third

18    party to the United States, but it could also be something like

19    permitting a person to, I guess, enter society or something

20    like that, to be introduced to.  That is what the CDC has

21    interpreted this provision to include, and so this provision

22    and its prohibition on introduction, or the grant of authority

23    to prohibit introduction, includes the grant of authority to

24    prohibit persons from entering society, or something like that.

25         And that, while that may not be the only plausible

1    interpretation of the statute, it is at least a reasonable one

2    as to which the CDC gets some deference.  What is your answer

3    to that argument?

4         MR. GELERNT:  Yes, Your Honor.  So -- so two basic

5    points.  The -- the first is that we don't believe that the

6    government gets *Chevron* deference here because there really was

7    no considered interpretation laid out anywhere of the term

8    "introduction" by the agency.  Obviously counsel in a brief has

9    tried to do a better job.  As this Court knows, ultimately you

10   have to look to what the agency did, and I think that there was

11   a conclusory or nonexistent interpretation.  So I think under

12   this Court's decisions -- under D.C. Circuit's decision in *Fox*

13   and other decisions, conclusionary statements would not get

14   deference.  And so we don't think *Chevron* applies at all.

15        But we also believe -- our second point is even if you

16   were to apply *Chevron*, we don't believe that the statute is

17   ambiguous.  And, you know, I take Your Honor's point that

18   "introduction" conceivably could have different meanings.  We

19   think the better meaning would be third parties, because it

20   would be too awkward to say you're introducing yourself into

21   the country.  And I think the Supreme Court decision we cited

22   using that term bears that out.

23        But I think it goes beyond just the text.  If it was

24   just the text, I think it would be a closer case, but I think

25   when you look at the context, all the provisions are dealing

1   with vessels in 1894.  The penalties are on vessels.  And then

2   you look at the legislative history, and it's very clear that

3   this was not creating implicitly a parallel deportation

4   process.  I mean, that would have been a remarkable thing for

5   Congress to do by implication.  And it's -- this is laser

6   focused on third parties and ships.

7        So I think when you use all the tools of statutory

8   construction, we don't believe that the government's

9   interpretation is even reasonable.  But I don't think the

10  government truthfully has grappled -- you know,

11  respectfully has grappled with all of those tools and really

12  dug into the legislative history.  The only point they've made

13  is that the legislation move from just regulating immigration

14  to regulating all persons, including citizens, but, again, that

15  doesn't bear on the distinction between ships, third parties,

16  and nonthird parties.  And, in fact, I think it helps our side

17  because it seems highly unlikely that Congress implicitly would

18  authorize the expulsion of citizens.

19       But -- but our central point on the deference is I think

20  Your Honor can look at the IFR and all the orders and can see

21  no actual considered interpretation of the word "introduction."

22  And beyond that, I -- I would note, again, what Judge -- then

23  Judge Kavanaugh said in the *D.C. v. DOL* case; when all of a

24  sudden there's a new interpretation of a statute after decades

25  and decades in that case, 80 years, the Court should be very

1    hesitant to find a new interpretation of a statute that's

2    proper.  And in our case, it's well over 80 years.  It's 127

3    years.

4         Contrary to the government's suggestion, the government

5    has used section 265, has invoked it.  It has never invoked it

6    for expulsions, including the meningitis outbreak in 1929, the

7    Spanish flu.  And so now all of a sudden this is a very new

8    interpretation after more than a century without any considered

9    discussions.  So at a minimum, I think the agency would have to

10   go back and offer some interpretation in order to get

11   deference.

12         THE COURT:  Thank you.  I -- I interrupted you.  You

13   were, I think, going to move on to another merits-related

14   point.

15         MR. GELERNT:  Your Honor, I was -- thank you, Your

16   Honor.

17         I was going to move on to our second argument, which is

18   even if the Court decides that section 265 does authorize

19   expulsions for some people or the Court wants to pretermit that

20   question, that broader question, and just focus on the narrow

21   question of whether people -- children or those seeking asylum

22   can be removed without any procedures based on section 265.  We

23   believe the answer is clear; that, you know, as the

24   Supreme Court, this Court has said over and over, the courts

25   needs to look at the entire legal landscape and try to

1    reconcile them.  We have Congress enacting the TVPRA and the

2    various asylum statutes recently and continuing to update those

3    statutes and providing very specific protections to children.

4    And Congress then put in very specific instructions when those

5    statutes would not apply and has never once said communicable

6    diseases or public health emergencies override that.  And

7    that's, of course, consistent with international law as -- as

8    some of the amicus briefs indeed -- it's not as if Congress was

9    not aware of the problem of communicable diseases.  It has been

10   aware of that issue obviously in the immigration context back

11   to the 1890s, and it has always said people with communicable

12   diseases can be removed.

13        But one thing Congress has not allowed is the

14   communicable disease inadmissibility ground to override the

15   protections for children or asylum seekers.  And so what we're

16   talking about is simply providing the process to those subset

17   of groups.  I don't think the government has offered any real

18   interpretation of those provisions, given the exemptions in

19   those provisions and given that they do not provide an

20   exemption for public health or communicable diseases, that

21   would allow this Court to find that a child is not entitled to

22   those protections that the Congress has afforded for -- for

23   minors.

24        And -- and in terms -- I just want to address the

25   deference point, because our deference point is, to some

1    extent, the same as in the first question, but I think there's

2    an additional point.  One point is we don't believe *Chevron*

3    should apply because it's conclusionary.  Again, that -- that

4    point remains, but I think also this -- the way where the

5    courts have been very clear, that where there are two statutes

6    that need to be reconciled, that that is a place for the courts

7    to do, especially here where you have the CDC having no

8    expertise about the immigration laws and, conversely, DHS

9    having no expertise about the -- the public health laws; that

10   that is not a place where the courts would defer.  And so -- so

11   we do think that Congress has paid specific attention to

12   children, has decided what exemptions there should be for

13   asylum laws, and is not creating one for public health.

14          So unless the Court has questions about that, I would

15   just maybe briefly talk about our arbitrary and capricious

16   claim and then move to irreparable harm, unless -- I don't want

17   to --

18              THE COURT:  Yes.

19              MR. GELERNT:  Okay.  Thank you, Your Honor.

20              THE COURT:  Thank you.

21              MR. GELERNT:  Our arbitrary and capricious claim, I

22   think, is -- is fairly straightforward.  We are not asking the

23   Court to second-guess different determinations by the CDC.

24   What we are simply saying, I think in line with the

25   Supreme Court's most recent decision on this in the DACA case,

1   is that the agency did not consider various factors and, in

2   particular, did not consider various factors about children.

3   That with respect to children, that children have a sponsor to

4   go to, that they are -- they spend very little time in CBP.

5   They have to be transferred within 72 hours out of CBP

6   facilities.  That although, as the government points out,

7   children can, of course, get COVID and can spread it, there are

8   differences in the rates and that that's something that the

9   government should have taken into account, as well as just the

10  severe harm to children of sending them back to danger.

11         These are unaccompanied children, and the government

12  does not have an age limit.  So this child before you is 16,

13  but the reports are that the children are much younger than 16.

14  And so I think the agency was required to consider the harm,

15  consider the difference in transmission rates, consider the

16  fact that children, unlike adults, have to be transferred out

17  of CBP immediately, within 72 hours, to ORR facilities.  They

18  are then not held in congregate settings for too long.  They

19  are sent to sponsors.

20         So our -- our point is -- again, is a straightforward

21  one, I think, and most recently reaffirmed by the Supreme Court

22  in DACA, that those things should have been carefully

23  considered with respect to children.  Whatever else the agency

24  was going to do, it had an obligation to look at children very

25  specifically.

1      And the government, of course, says, well, the agency

2    doesn't have to look at every possible scenario, but I think --

3    I would be surprised if counsel comes on next and says, well,

4    the government wasn't aware that children come as

5    unaccompanied.  I mean, that has been an issue that has been an

6    enormous one in the immigration world.  There is -- there's

7    been national litigation for decades over that.  The government

8    specifically has provisions about unaccompanied children.  Of

9    course, most importantly, Congress has the TVPRA, and so this

10    wasn't some sort of incidental aspect of the issue that the

11    government didn't consider.  It was a central part of these

12    expulsions, and yet there is no specific discussion of it in

13    the IFR or any of the three orders.

14       Unless the Court has questions about the arbitrary and

15    capricious claim, I thought I would turn to the irreparable

16    harm, unless the Court wants to leave that for later.

17       THE COURT:  No, please.  I would like to hear you on

18    irreparable harm.

19       MR. GELERNT:  Okay.  Thank you, Your Honor.

20       So on irreparable harm, we have three basic points.  One

21    is, as the Court knows, irreparable harm wouldn't go to the

22    legal questions.  If Congress has decided that section 265

23    doesn't permit expulsions or that at least for asylum seekers

24    and children expulsions are prohibited, then that would not be

25    part of the irreparable harm analysis.  The irreparable harm --

1     I mean, the harm analysis.  The harm goes to right now the

2     irreparable harm prong of the TRO.

3          And on that we have two basic points.  One is that this

4     case involves one 16-year-old boy.  The government has

5     understandably tried to broaden it and say the Court at this

6     state in this emergency motion should try and determine the

7     balance of irreparable harm to the country as a whole versus

8     all the children who may be -- who may be expelled.  And we

9     don't believe that's proper given that the relief we're asking

10    for is only that this Court stay this one boy's removal.  And I

11    think on that, the government really hasn't made a claim that

12    this one boy could not stay in the United States until this

13    Court, on an expedited schedule, resolves a summary judgment

14    motion, or however the Court wants to deal with it, whether

15    it's a preliminary injunction or summary judgment.

16         And we, of course, are ready to move at whatever speed

17    the Court and the government wants to move at, but I don't --

18    this boy does not have COVID.  He has been kept safely here.

19    He can live with his father.  I don't think there really is --

20    and I don't think the government seriously claims -- that

21    there's harm from keeping this one boy here, and that's the

22    only relief we are really requesting.

23         Then -- so because that's the only relief we're

24    requesting, we have not put in affidavits and not made broad

25    arguments about the systemic harms generally and the balance of

1    harms.  We would note, just in passing almost, that from the

2    IFR through the final May indefinite order, the government has

3    retreated to some extent and said -- well, you know, they

4    originally said testing takes three to four days.  It's not

5    available.  The latest order doesn't make that point, of

6    course, because testing is available now and it can be done

7    very quickly.

8         We would also note just broadly looking at children,

9    because they only stay in CBP for 72 hours at most -- and

10   usually it's less than a day or -- or a night -- that they're

11   going to spend less time in CBP if they're transferred to ORR

12   than they would if they have to be put on a plane.  What

13   happened to this boy is what's routinely happening, is that the

14   child spends time in CBP, then goes to a hotel where CBP has to

15   guard the child, or at least accompany the child, in the hotel

16   room for up to a week before they can find a plane.  So I think

17   when you -- even when you look at it broadly, it's hard to say

18   that the CBP would be suffering harm by sending children to

19   ORR.

20        But, again, I don't want to lose our central point,

21   which is we are asking for very limited relief, and this is

22   just staying this one boy's order, and I do not believe the

23   government can say allowing this boy to go to his father's

24   house or even a limited amount of time in an ORR facility and

25   then be transferred to his father would cause irreparable harm.

1       On -- on the other side of the ledger, this boy is in

2  serious, serious danger if he goes back to Honduras.  I don't

3  want to get too deep because we're on a public call.  And I

4  know the Court has looked at the sealed affidavit, but he would

5  be in very serious danger.  And as a comparator measure, he

6  would be in more danger than the government would be in keeping

7  this one boy here.

8       So unless the Court has further questions, I -- I will

9  stop there.

10      THE COURT:  I will -- I have one procedural question,

11  which is if I were to extend the order prohibiting the

12  plaintiff's return or removal, how quickly would you be

13  prepared to file merits summary judgment briefs if I concluded

14  that the -- the right procedural approach here was to, on a

15  fairly -- the ultimate adjudication of this case -- but not

16  have it mooted out by his return, could you -- could you file a

17  motion for summary judgment?

18      MR. GELERNT:  Yes, Your Honor.  So -- so I want to --

19  we are prepared to do it on any speed the Court -- any schedule

20  the Court would want.  And so we don't believe that we should

21  rewrite everything.  We will refer to these briefs where

22  necessary and can do it in less than a week, file an opening --

23  opening brief.

24      The one caveat that I would say is that if the Court

25  wants the administrative record before it -- and I assume it

1    probably does -- that we would need time to look at the

2    administrative record to make sure that there are no additional

3    arguments we would want to make or nothing that the Court would

4    want us to address, and also to resolve any disputes if we

5    thought that the administrative record was lacking something or

6    wasn't complete in what we got.  But the bottom line is we are

7    prepared to move as quickly as the -- as the Court would want

8    us to do, subject to the government providing the

9    administrative record.

10           THE COURT:  Thank you.

11       Why don't we turn then -- thank you for the argument --

12   to the government.  Ms. Lin, will you be taking the lead?

13           MS. LIN:  Yes, I will.

14           THE COURT:  So obviously there are a number of

15   substantive arguments that I would like to get to, but because

16   we were on this topic -- and this is obviously without

17   prejudice to your contending that this is not at all the course

18   I should take, but if I were to conclude that the appropriate

19   procedure here would be to extend the stay or injunction of the

20   removal or return for some period of time while the parties

21   brief summary judgment motions, how quickly could the

22   government, in your view, move and -- and, realistically, how

23   soon from now could we have fully briefed summary judgment

24   motions?

25           MS. LIN:  Your Honor, I think that the -- the best

1  information on the speed in which the agency can compile -- the

2  agency can compile the administrative record is something close

3  as possible to July 10th.  And -- and part of the reason is

4  also that there are -- there is sensitive information in the

5  administrative record that would need to be carefully vetted,

6  not only among the agencies with equity, and there could also

7  be diplomatic sensitive information.  So we would first need to

8  seek a protective order to protect that, but we're still in the

9  process of trying to assess all of the information that was

10  considered.  So July 10th will be the outset best possible

11  scenario for us to do it properly but expeditiously.

12            THE COURT:  For purposes of the administrative

13  record.  And then, thereafter, I assume the government would be

14  prepared to move reasonably quickly on merits briefs?

15            MS. LIN:  Yes.

16            THE COURT:  Okay.  So why shouldn't that be the right

17  course here?  I obviously don't have before me the

18  administrative record.  There are a number of arguments that

19  have been made that are not particularly dependent on the

20  administrative record, but why not extend the stay of removal

21  or return, or however one wants to phrase it?  But the order

22  I've already entered -- until we can on a very expedited basis

23  resolve the merits here?

24            MS. LIN:  Your Honor, I think that what it comes down

25  to is this case is really trying to determine a legal question,

1     which is what the section 265 authorizes the CDC to do, and we

2     think that question answers the entire challenge here.  And --

3     and, you know, even in the context of an emergency motion, it

4     is clear that you need to have a likelihood of success in order

5     to get the PI or the TRO in this instance.

6          And putting aside the degree of irreparable harm, the

7     Supreme Court since *Winter* has addressed PI motions in the

8     context -- for example, in the context of the Eighth Amendment

9     of lethal injection challenges.  And there the Supreme Court

10    says, you know, we balance the likelihood of success.  It

11    doesn't matter as to the other factors, because the likelihood

12    of success will be independent.

13         And so here we have a situation where the pure question

14    of law before this Court can be decided based on the Court's

15    interpretation of the language and the available textural --

16    structural, textural, or even legislative history that

17    plaintiff wants to rely on, and all those strong indicators

18    suggest that the CDC has the authority to do what is currently

19    happening to the plaintiff.

20         THE COURT:  But can I meaningfully decide the

21    arbitrary and capricious challenge without the administrative

22    record?

23         MS. LIN:  Yes, Your Honor, because the CDC order

24    thoroughly considers many factors and many questions relating

25    to the public health.  Remember, this is a public health order

1    designed precisely to address a very unique situation of a

2    pandemic.  And the -- the APA's arbitrary and capricious

3    standard is highly deferential, and so there is a no basis to

4    say this is somewhat arbitrary given that the Court can fairly

5    discern the path that the agency took to reach its decision and

6    the factual findings of the CDC director considered are all

7    presented in the orders themselves, particularly the first

8    order and -- and as well why subsequently the order need --

9    needed to be extended.  So all those considerations are there.

10            And in terms of interpretation of the terms of the

11   statute, which is particularly the phrase introduction of the

12   persons or prohibition of introduction of persons, we -- we

13   only currently have an interim final rule.  There is not a

14   rulemaking record in the sense of having received public

15   comments, considered the comments, and then issuing a final

16   rule.  So all of the basis the agency is thinking are reflected

17   in the -- in the order itself.

18            THE COURT:  So let's focus on the statute then, and I

19   understand the argument, and I also understand that in at least

20   some respects this case presents some relatively pure questions

21   of law.  What in the government's view is the power to prohibit

22   the introduction of persons?  What does that mean?

23            MS. LIN:  Your Honor, our position is that the power

24   to prohibit -- for it to be effective, the power necessarily

25   has to include the physical removal of persons from the

1    United States, even after the person has surreptitiously

2    crossed the border and is apprehended while in process of -- of

3    getting into the interior of the border.  And that --

4                   (Indiscernible simultaneous cross-talk.)

5              THE COURT:  Ms. Lin, does that mean that if in a

6    different hypothetical, but one that I teed up a little bit

7    earlier, if there was an Ebola outbreak in Mexico and it was

8    determined that it was unbelievably contagious, and even more

9    so by -- by matters of degrees than COVID-19, and the CDC was

10   concerned about anyone coming from Mexico to the United States,

11   including nonaliens, including U.S. citizens, and some -- some

12   U.S. citizens -- and the CDC, I take it, in your view, would

13   have the power both to prohibit all entry from Mexico to the

14   United States by anyone and then to effect the return to Mexico

15   of anyone who slipped through, including citizens?

16              MS. LIN:  Yes, Your Honor.  I mean, obviously right

17   now, the -- the language is broad.  It says persons, and that

18   would include both citizens and noncitizens, but -- but the

19   idea about barring the entry of U.S. citizens, I think that it

20   kind of -- the -- the fundamental premise of the plaintiff's

21   argument, it seems to me that they're saying because you

22   necessarily cannot bar the reentry of U.S. citizens, so,

23   therefore, clearly you can't bar anyone.  And that's a faulty

24   premise, because, you know, in a case -- in the hypothetical

25   scenario that Your Honor describes, if there is compelling

1    government interest in preventing the entry of U.S. citizens

2    for a short duration during a very serious pandemic or Ebola

3    outbreak of the type you described and the -- and the barring

4    of the entry is done so in a very narrowly tailored way to

5    address a particular public health crisis, then there is no

6    reason to think that that would necessarily be unconstitutional

7    and, therefore, it then impacts how Your Honor interprets the

8    language, which is --

9                (Indiscernible simultaneous cross-talk.)

10               MS. LIN:  -- and broad.

11               THE COURT:  It seems to me, though, that there's a

12   difference between barring the entry of persons, including U.S.

13   citizens and -- on the one hand and on the other authorizing

14   the removal of persons who have made it into the physical

15   United States.  And for your argument to work, for the power

16   for the introduction of persons to include the power to remove

17   or return someone in the plaintiff's situation, I think you

18   have to acknowledge that this would -- that that language would

19   also permit the removal of U.S. citizens who, in my

20   hypothetical, make it into the United States from Mexico in the

21   context of the Ebola outbreak.

22               MS. LIN:  Yes.  If, Your Honor, the CDC order -- the

23   CDC director determines that -- that such a removal is also

24   required -- remember, the language of section 265 itself is

25   it's broad and unambiguous, but it also recognizes that there

1    would necessarily be regulations that -- that would address

2    particular circumstances.  And that is precisely our point;

3    that this is entrusted to the judgment of the public health

4    officials to make that determination because --

5              (Indiscernible simultaneous cross-talk.)

6              THE COURT:  But that is a remarkably broad power

7    found in a provision that talks about prohibition of

8    introduction.  And so, again, I return to the question of what,

9    in your view, does the power to prohibit the introduction mean

10   exactly?

11             MS. LIN:  Your Honor, this -- this -- the term is

12   defined by the CDC in the interim final rule itself, and it

13   lays out what introduction of persons details, and it's in the

14   interim rule final -- final rule 42 C.F.R. 71.40(b)(1).  And it

15   says it's to -- to -- it means the movement -- introduction

16   into the United States of persons from a foreign country or

17   place means the movement of a person from a foreign country and

18   to place that -- and to place that person within -- in contact

19   with -- with people within the United States.  And so this also

20   then means that it's the removal of such person, is amidst of

21   that movement.

22             And this is what the CDC order interpreted to say that

23   it means that people who are apprehended and who are then

24   brought to the -- the congregate setting would then be returned

25   as soon as possible; that kind of -- using Congress's term

1    prohibition of introduction, because that's why prohibition is

2    there, to stop someone from doing something.

3          And, you know, Your Honor is right that this is a very

4    broad power, but, again, you know, it is -- again, I refer

5    Your Honor to section 265's language itself, is to say that

6    this -- whatever the Surgeon General determined and then, you

7    know, these -- obviously these conditions have to be met.  But

8    it also says ". . . in accordance with regulations . . . shall

9    have the power to prohibit . . ."  So clearly Congress is not

10   trying to think all possible scenarios in terms of how this

11   would apply in any particular circumstance.  That's where the

12   regulation comes in.  And, you know, I think we dispute the

13   idea that this section 265 is to address purely a precise

14   analysis that might have been in Congress's mind at the time

15   they enacted 265.

16         So we -- first of all, we think it's simply incorrect to

17   say that this section 265 was enacted to address the specific

18   problem of people coming in on ships, because that's -- that

19   problem was addressed in a different part of section -- of the

20   Act of 1893.  It's addressed in section 6, which talks about

21   quarantine, talks about sanitation, talks about all these other

22   things relating to conditions that may present a public health

23   risk if vessels were to dock or to come to the ports of our

24   country.  So for section 7, it doesn't say anything about the

25   situation having to do with vessels.

1        So, yes, it is meant to be a very broad power, and, you

2    know, the -- the legislative history we cited shows that it

3    was -- it's the intention -- initial language of -- bars only

4    immigration was amended, was rejected, and ultimately the

5    decision was to say it's going to bar all persons.  So that

6    shows that Congress is trying to conceive a situation where

7    there could be a significant outbreak.

8        And -- and, again, as Your Honor is well aware, this --

9    this type of communicable disease doesn't stop at the border.

10   It's not -- it doesn't lend itself to limitations by geographic

11   boundaries.  So Congress's intention is to mitigate the public

12   health threat, and so this interpretation is in line and

13   consistent and is plainly contemplated in the statute itself.

14       So if I could just make one more point about the

15   interpretation as to why this sounds so broad.  One other thing

16   to -- to note is, you know, the fact that Congress might not

17   have thought about the situation that we're confronting today,

18   this doesn't fully fit that, does not mean that it wouldn't --

19   that the statute doesn't extend to that degree.  It's only the

20   statute is plain, that's what controls, and as Your Honor may

21   be aware, the Supreme Court just about a week ago decided the

22   *Bostock* case, and that has to do with Title VII of the

23   Civil Rights Act of 1964, prohibits an employer from firing

24   someone simply for being gay or lesbian or transgender.  And so

25   the Supreme Court said that those who adopted the Civil Rights

1     Act might not have participated a world to this particular

2     result, but -- and likely that they weren't thinking about many

3     of the Act's consequences that have become apparent over the

4     years, but the limits on the drafters' imagination supply no

5     reason to ignore as the law demands.  And so what we have here

6     is there's law, broad and unambiguous language, and that's what

7     should be given effect to.

8               THE COURT:  So don't I need to read this -- and I

9     surely am familiar with *Bostock* and what the court said about

10    language, but don't I have to read this statute, to the extent

11    possible, in harmony with other statutory provisions out there?

12    And it seems to me that there are three aspects of other

13    statutes that are relevant to how one would harmonize this

14    statute with those.

15         The first is that other statutes clearly use the term

16    "removal" or other verbs or -- or subjects that at least more

17    clearly comes to a grant of the power to send someone back,

18    where here that power is being implied from the definition of

19    introduction.  That's the first -- first issue.

20         The second is there are provisions in the immigration

21    statutes that deal with communicable -- communicable diseases

22    and quarantines, and I think one has to read this provision in

23    harmony with those.

24         And the third -- and I think this is where the plaintiff

25    spends most of his time on the harmonization question, is one

1    needs to read this provision potentially in light of Congress's

2    special treatment of minors through statutory protection that

3    apply only to them and upon their having entered the country.

4    And so I -- I understand your argument about this provision,

5    but don't I have to ensure that it can be read consistent with

6    other statutory provisions that do have some relevance here?

7         MS. LIN:  Yes, Your Honor, and if I may address each

8    of those concerns in turn.

9         On the term -- on the idea that the immigration laws do

10   provide procedures for removal for expulsion or -- the --

11   the -- putting aside the proper terminology, that may be the

12   case, but by interpreting 265 to -- to give it the effect that

13   we urge doesn't mean that the immigration laws, therefore, are

14   rendered ineffective or that they are no longer, you know,

15   applicable.  What we have here is that a -- a temporary

16   suspension of application of these immigration procedures to a

17   subset of aliens determined to be posing public health risks.

18   And so they apply across -- those provision apply across the

19   board where the section 265 scope is very limited and very

20   targeted.

21        It is the most rarest of the situation as we have today,

22   a global pandemic, which is unprecedented.  So you can -- you

23   can harmonize the two statutory schemes in that way because

24   Congress clearly intended that when there's a public health

25   emergency threatening the American public, that has to take

1    precedent.

2         THE COURT:  But I'm not sure you're quite grappling

3    with my question, which is -- and maybe -- I apologize -- I

4    didn't frame it quite clearly enough.

5         It seems to me that the immigration statutes -- well,

6    let me back up for a second.  It seems to me that there are at

7    least three relevant terms that we need to define or at least

8    potentially think about defining.  One is entry, one is

9    introduction, and one is removal or return.  And it's quite

10   clear that one thing Congress did not do in the statute was

11   expressly grant the Surgeon General and the director of the CDC

12   the power to order the return or removal of persons.

13        The question is whether the prohibition on introduction

14   includes the power to remove.  Plaintiffs say it doesn't.  You

15   say it does.  But why is that so?  If Congress in the

16   immigration statutes knows how to grant either protections

17   around or authority regarding removal but did not do so at

18   least expressly here, why don't we infer from that that

19   Congress didn't intend to grant the Surgeon General or director

20   of the CDC the power to remove?

21        MS. LIN:  So, Your Honor, the term "introduction"

22   kind of -- kind of -- if I -- or should ride on how we

23   determine what return means.  But, yeah, Congress didn't use

24   the word "removal," but it's also not doing that in

25   section 265.  Remember, the government's position and the

1  interpretation is this is -- only applies to those who are

2  still in the midst of moving into the United States, just

3  crossed the border, and they're near the border.  We're not

4  talking about the situation that plaintiff is positing, which

5  is a situation where someone who's already in the United States

6  was no longer being introduced, and so this you can see from

7  the cases that the plaintiff relies on.  *Valentine v.*

8  *United States* case that they say we failed to discuss in our

9  opposition brief, it involved the extradition -- extradition --

10 sorry -- extradition of native-born U.S. citizens who are

11 charged with crimes in foreign crimes, or in *Padilla v.*

12 *Kentucky*, we're talking about a lawful permanent resident who

13 has lived in the United States for 40 years and was being

14 deported.  We're clearly not talking about those kinds of

15 situations.

16      So to say that it's because this is akin to, you know,

17 perhaps ex- -- extradition or the type of deportation due to

18 criminal convictions, that's not -- that's not what we're

19 saying, and that's not -- how the 265 should be interpreted

20 anyway.

21           THE COURT:  And a year ago, if -- if the plaintiff

22 had been apprehended as he was, he would have been placed in

23 so-called removal proceedings; correct?

24           MS. LIN:  Yes, I believe so.

25           THE COURT:  So Congress at least would have thought

1    that -- that even when he was apprehended, you know, very close

2    to the border and before entering society in the sense that you

3    discuss, Congress would have described the proceedings into

4    which he would have been placed as removal proceedings even at

5    that very, very, very early stage of his entry.  Why doesn't

6    that suggest that what is happening here is also a removal or

7    would also be a removal?

8           MS. LIN:  Because the Public Health -- the Public

9    Health Service Act provisions are not thinking in the framework

10   of immigration.  So it's not using terminologies as they would

11   in an immigration context.  It's talking about what the

12   government is authorized to do, the chief public health

13   official is authorized to do in the face of a pandemic such as

14   this, and using the word prohibiting -- shall have the power to

15   prohibit the introduction, for that to have meaning, it has to

16   encompass a scenario that we're talking about here because,

17   again, Congress was clear --

18          (Indiscernible simultaneous cross-talk.)

19          THE COURT:  Well, you just said it has to encompass.

20   Why can't this provision mean that the director of the CDC or

21   the Surgeon General can prohibit anyone from entering Mexico --

22   entering from Mexico?

23          MS. LIN:  It certainly can do that and it does do

24   that, but as Your Honor must realize -- right? -- because a lot

25   of times covered aliens will present themselves to that -- at

1   the ports of entry or the border patrol stations.  And so

2   they're going to be people who are apprehended near the border.

3   And so this is the kind of situation that Congress intended

4   that, you know, in the future, you will issue regulations to

5   govern that kind of scenario and, so again, because the disease

6   doesn't stop at the border.  So -- so it's -- it doesn't -- it

7   doesn't mean that the power stops at the border.

8        And so here in formulating the regulations, the CDC

9   considers the risk of the disease can be traveling into the

10  United States through travelers, and so that was something that

11  underlies the concept that when you're -- when you have the

12  power to prohibit, it necessarily includes for those who slip

13  through the border even for -- for -- for a mile or less, you

14  know, or anywhere has to be effective in order to achieve the

15  purpose of the statute, which is to stop the spread of the

16  disease.

17       So, again, you know, there is significant discussion by

18  the CDC director talking about that because these kinds of

19  aliens, these kinds of covered aliens, present the same risk as

20  those who present themselves at the border because they're all

21  held at the congregate setting.  So -- so it is certainly --

22  it's not entirely directed by the plain language.  It is

23  certainly a reasonable interpretation as authorized by the

24  statute for the CDC to do.

25            THE COURT:  Can you -- can you address the two other

1    ways in which -- my question indicated the statute needs to be

2    harmonized with others, and one is, you know, obviously the --

3    the ways in which the immigration statutes deal with

4    communicable diseases and quarantine issues, and then the

5    second is the special protections that are granted in the

6    immigrations statutes to minors?

7         MS. LIN:  Sure, Your Honor.  So I was moving on.  So

8    on the question about the health -- health-related grounds for

9    inadmissibility, so that certainly is there and they -- in

10   fact, they've been there since the plaintiffs said even before

11   the enactment of the predecessor statute section 265.  And so

12   they -- so just like their existence cannot mean that

13   Congress -- that Congress didn't also intend to authorize the

14   CDC or the Secretary to address a situation of a pandemic.

15        Again, we're not saying that these provisions, the

16   health-related grounds or inadmissibility, are -- are

17   inapplicable.  All we're saying is it's trying to address an

18   entirely different situation.  They're trying to address the

19   individual circumstances of the people who are seeking

20   admission to the United States.  So if you look at the

21   provisions, for example, talking about, you know, this is --

22   referring to 8 U.S.C. 1222, it says for purposes of determining

23   whether an alien is admissible, it can detain the alien for

24   observation and an examination for a sufficient amount of time

25   to determine whether he belongs in an inadmissible class.  And

1    the -- having a communicable diseases is an inadmissible ground

2    for -- is the ground that an alien is not admitted.  So that

3    process, you know, firmly -- would work in the normal ordinary

4    case when we're not facing a public health crisis.  So that is

5    not more specific in any particular -- it's not -- any

6    particular way, because it applies across the board to all

7    aliens who present themselves to try to enter the

8    United States.

9            So, again, the -- the rule of the statutory construction

10   of the specific versus general would -- would -- should lend

11   support to the interpretation that 265 should override

12   temporarily and, to a limited extent, to the covered aliens

13   that are addressed by the CDC order.  So, yes, in the sense

14   that the -- the -- these precise provisions aren't applicable

15   in that short duration, but that, by no means, suggests that

16   265 should be rendered a nullity because -- which is kind of

17   what the plaintiff is proposing here.

18            THE COURT:  All right.

19            MS. LIN:  Does that answer your questions?

20            THE COURT:  Why isn't their reading not rendering 265

21   a nullity but authorizes the CDC to prohibit, in my view,

22   perhaps the entry of people from Mexico, notwithstanding all

23   other substantive immigration laws or orders, perhaps to

24   include U.S. citizens, so it could have true teeth, but to

25   harmonize that power, or at least the statute with other

1    immigration statutes, is to say but there are other statutes

2    that deal with the treatment of persons once they are on U.S.

3    soil, generally and specifically minors, and that saying the --

4    the CDC still has the power to basically shut the border with a

5    country in the context of a true communicable disease concern

6    is not to read no power for the CDC but is to simply say

7    that -- but that once the person is in the United States, there

8    are all these other statutes that apply.  And nothing in 265,

9    at least by its terms, includes language like notwithstanding

10   any other law, and there's nothing at least expressly in 265

11   saying that 265 takes precedent over those other statutory

12   protections.

13        MS. LIN:  Your Honor, I think that the language --

14   the questions that I answered is -- is answered by 265 itself;

15   right?  That it doesn't draw a line at the border.  Congress

16   could have, but Congress didn't draw the line at the border.

17   And, again, for there to be power to prohibit the -- the

18   scenario Your Honor describes is -- will present the kind of

19   public health risk that the CDC order is designed to address.

20   Because we're talking about people who then would seek entry or

21   cross the border illegally between ports of entries and those

22   are taken into congregate settings and, therefore, present the

23   kind of public health concerns that the CDC director is trying

24   to avoid.

25        So, again, because the statute doesn't draw the line at

1    the border and is an invisible line in that sense -- so we have

2    to look what is the power that is given as opposed to drawing

3    an arbitrary line that Congress itself doesn't even draw, and,

4    in fact, Congress must have known that, you know, diseases

5    don't stop at the nation's borders.  So I think that the fair

6    interpretation and the correct interpretation is not to then

7    arbitrarily set a line to the power of the 265 that Congress

8    has given the CDC to enforce.

9            THE COURT:  Thank you.

10           Do you want to turn to the arbitrary and capricious

11   argument and then address irreparable harm?  And then -- and

12   then I think we'll turn back to the plaintiffs for rebuttal --

13   or plaintiff for rebuttal.

14           MS. LIN:  Your Honor, I would like to just address --

15   I'm sorry.  I didn't touch on the third question that you

16   actually had about --

17           THE COURT:  Oh.

18           MS. LIN:  -- children in particular and why there was

19   no carve out for children.  And I think that this is -- you

20   know, just going back to the idea that this is a public health

21   order designed to address a public health emergency.  So we

22   have a situation where the covered alien includes adults and

23   children, and the consideration that the CDC director had was

24   that who was presenting public health risk and who are the ones

25   that need to be -- whose -- whose introduction need to be

1    prohibited.

2         And so it's in that context that the children and adults

3    are treated alike.  Because what -- from the public health

4    prospective, the CDC director's view is that this is -- this

5    collective group is a group that's presenting a risk.

6         So if you look at the covered alien groups, they're not

7    homogeneous.  They -- you can probably put them in various

8    different kinds of categories, but that's not the public health

9    consideration before the CDC.  So, of course, the CDC director

10   was aware of the impact on covered aliens, and that would

11   include both adults and children and -- and particularly about

12   their -- their right to pursue procedures under the immigration

13   laws.  But he drew the line as to those who he determined to

14   present the serious health risk, and he's, again --

15   Your Honor -- as Your Honor's aware, he's the nation's top

16   official on how to best protect the public, and, you know, just

17   as Your Honor has recognized and Chief Justice Roberts has

18   recognized, that the situation on the ground is rapidly

19   changing.  And this is -- this is -- the public officials are

20   trying to actively shape their responses to changing facts.

21   And this is, you know, again, the first pandemic that the

22   United States has faced since the early -- early 20th century.

23   So -- so all these need to be taken into account in

24   assessing -- well, maybe the order should have been carved this

25   way or tweaked this other way.  So that -- it's a kind of

1    public health determination that we urge the Court not to

2    engage in.

3           THE COURT:  Thank you.

4           MS. LIN:  So I guess, you know, moving on to the

5    arbitrary and capricious point, I kind of -- or the preview,

6    which is these arguments that I've just said, you know, apply

7    equally to the arbitrary and capricious discussion, but, again,

8    the standard for reviewing agency action under the arbitrary

9    and capricious standard is highly deferential and is very

10   narrow, and the Court -- the Court's review is very limited to

11   see where the CDC director articulated reasons that justifies

12   his actions in a way that even if this Court does not agree

13   with the CDC director's determination.

14          So there are four central points that underlie the CDC

15   director's assessment, which is that there are just practical

16   constraints related to the physical structure and operation of

17   the CBP facilities at or near the border, and those are, at

18   least in the short term, insurmont- -- insurmountable and

19   practical problems that must be taken into account for -- for

20   the -- the public health measure to be effective.

21          And also this is a disease that is highly contagious.

22   There are no vaccines.  There are no widely spread

23   therapeutics.  And -- and because of the nature of that -- this

24   particular disease, that causes the physical structures and

25   operations to be -- key facilities to be even more vulnerable

1    to -- to be incub- -- incubators of diseases.

2         And the third is the consideration of the public health

3    care resources that we have at the -- near the border region,

4    you know, states.  The CDC director determined that the states

5    along the southern border have some of the lowest numbers of

6    hospital beds per hundred thousand people.  And, you know,

7    three of those states -- I think Arizona, California, and

8    Texas -- they have the largest numbers of residents living in

9    primary care shortage areas.  And so that is another

10   significant consideration of having an influx of people who may

11   need to seek health care, could potentially severely affect the

12   resources available for the domestic population.

13        And, you know, there are also significant considerations

14   about potentially infecting DHS personnel who have very

15   important functions they have to perform at the border.  It's

16   not just immigration functions.  They also have law enforcement

17   functions and many other things to make sure that the people

18   crossing borders and -- and, you know, supplies crossing

19   borders are moving smoothly.  So all those very important

20   compelling government considerations underlie the CDC

21   director's decision.

22        And, you know, this is not something that they do so

23   just as a preventative measure in -- in that way, because both

24   Mexico and Canada are severely impacted by COVID-19.  And

25   especially recently Mexico has a huge spike in the number of

1   cases.  So these are serious and considerable harms that the

2   United States could be facing if there's free flow of people.

3   And, in fact, you know, as we lay out in briefs, the -- the

4   countries themselves -- the three countries themselves have

5   closed the border to travel.  So, yes, all of this seems like

6   very drastic measures, but we are -- but these are

7   extraordinary times, and the measures have to met -- measure up

8   to what is necessary to meet the -- the crisis that's being

9   presented.  And the CDC director did so.  And so, again, given

10  the deference that he's entitled both as recognized by the

11  Supreme Court and this Court about the importance of the

12  scientific basis of the public official's determination, all

13  those determinations are entitled to strong deference even

14  beyond just the typical, you know, APA arbitrary and capricious

15  review.

16          THE COURT:  Thank you.  Do you want to briefly

17  address the balance of harms, Ms. Lin?

18          MS. LIN:  Yes.  So the balance of harms here, again,

19  as I mentioned earlier, that the likelihood of success on the

20  merits should be determinative of the balance of harm question

21  because, you know, again, as I -- I don't -- I sound like a

22  broken record, but -- but here the harm that we're assessing is

23  the public health measure that has been determined to be

24  necessary by the top health -- public health official, and

25  he -- he determined that this -- his order is in the public

1    interest.

2         And so there is every government interest and public

3    interest in ensuring that his order is implemented.  And, in

4    fact, the -- the -- it's well recognized that any time the

5    government is enjoined by the court from effectuating the law,

6    it suffers the form of irreparable injury.  So this is

7    particularly the case here given the nature of the CDC order

8    before this Court.

9         And so, you know, the concern, of course, is that the

10   efficacy of the order will be compromised if we start chipping

11   away looking at each and every individual, whether, perhaps,

12   this person should be accepted and that person should be

13   accepted.  And that's not the premise, and that's not how the

14   CDC order can be effected.  So for those reasons, we think that

15   the balance of equities tips against issuing an injunction.

16        THE COURT:  Thank you very much, Ms. Lin.

17        Mr. Gelernt, would you like, I think, a short rebuttal?

18        MR. GELERNT:  Thank you, Your Honor.

19        Just a couple of very brief points.  It sounds like the

20   government would -- is saying the outer limit they need to get

21   the administrative record is July 10th, and I want to

22   reemphasize that we can be prepared to move very quickly once

23   we get the record in whatever amount of days the Court feels is

24   appropriate.  Certainly a week or less is fine with us.

25        Again, I want to just reemphasis on the irreparable

1    harm, we are only talking about this one boy so that the Court

2    can issue a considered summary judgment decision, and then if

3    either side wants to appeal that, it's a full decision.

4         The third point I would just make is on the other

5    countries.  I think we have put in evidence -- and I think the

6    Court can find evidence from UNHCR or other places, that asylum

7    seekers and children are not being turned way by other

8    countries.  Canada has expressly exempted unaccompanied

9    children.  So that, I think, is correct.

10        And, you know, again, on the children's point,

11   Your Honor, Congress has specifically said a child who shows up

12   at the border needs to be placed in removal proceedings.  And

13   whatever the government wants to call that expulsion, whatever,

14   it's clear they're being sent back to their -- their home

15   country like removal, and Congress has said whether they're

16   inside the country, right at the border, it doesn't matter.

17   These protections apply.  And I don't think the government

18   seriously contests that.

19        And so -- and our final point is just that the

20   government's position would suggest a very serious delegation

21   of power to an agency by implication, and that's in -- in

22   contrast to how the -- that Congress has always treated

23   removal, expressly stating it, and that's specifically tied to

24   children and asylum seekers.

25        So unless the Court has further questions, I would -- I

1  would leave it at that.

2           THE COURT:  Thank you.  Ms. Lin, anything you would

3  like to add?

4           MS. LIN:  No, Your Honor.

5           THE COURT:  Thank you.  So when we last convened and

6  we discussed the possibility of a briefing schedule and the

7  government's agreement not to return or remove the plaintiff

8  but for 11:59 p.m. today, I indicated that I would likely to

9  rule on the motion orally, I think in part, because of the

10  government's concern this move relatively quickly.  And so,

11  whereas in the normal course I might have written an opinion, I

12  am, in fact, going to do my best to rule orally here.

13           And in particular, I am going to extend the order

14  staying or enjoining the return of plaintiff to his home

15  country or his removal from the United States until I resolve

16  what I hope to be expedited summary judgment motions that --

17  that I intend to have briefed very quickly, but as to which in

18  the first instance, I'm going to have the parties meet and

19  confer for purposes of proposing a schedule, both for their

20  submission and then for their oral argument.

21           So that is the order that I will enter today.  So to be

22  clear, the plaintiff shall not be returned to his home country

23  or removed from the United States unless and until I resolve

24  the case on the merits.

25           As to the procedure for doing so, I'm going to order the

1    parties to meet and confer and propose to me either joint --

2    jointly a schedule or their own view for the schedule for the

3    submission of summary judgment briefs and oral argument on

4    those motions, taking into account, of course, the

5    representations by the government about the administrative

6    record.

7        Now as to the basis of the extension of the stay of the

8    prior order, it is true course that a party seeking preliminary

9    injunction or stay must demonstrate likelihood of success on

10   the merits, likely irreparable harm in the absence of

11   preliminary relief, a balance of the equities in its favor, and

12   in accord with the public interest.  Many cases say that,

13   including the *League of Women Voters of the United States v.*

14   *Newby*, 838 F.3d 1 at 6, D.C. Circuit (2016).

15       Plaintiff is a 16-year-old boy from Honduras whose

16   father is located in the United States and has a pending asylum

17   case.  Plaintiff was apprehended on June 4th, approximately

18   1 mile from the Texas-Mexico border after apparently having

19   crossed the border without presenting himself to U.S.

20   officials.  There's no indication that plaintiff has COVID-19

21   or any symptoms.

22       It is undisputed that if plaintiff had been apprehended

23   a year ago, he would have been entitled to various protections

24   applicable to minors in his circumstances.  Among other things,

25   the Trafficking Victims Protection Reauthorization Act created

1    safeguards related to the care, custody, and removal

2    proceedings of unaccompanied children and confirmed ORR's

3    responsibility to ensure their care.  Children from countries

4    other than Canada and Mexico must be transferred to ORR custody

5    within 72 hours of apprehension absent exceptional

6    circumstances.  ORR's responsible for housing the children and

7    properly placing them in the least restrictive setting.  ORR

8    does not operate its own housing facilities but, instead,

9    contracts with providers.

10            Further, TVPRA includes safeguards related to removal

11    proceedings, including full removal proceedings before an

12    immigration judge with the opportunity for administrative

13    appeal.  Those no fast-track removal process and unaccompanied

14    children are also entitled to access to counsel and a child

15    advocate.  The parties have -- the plaintiff has briefed other

16    protections that likely would have -- would have applied to

17    plaintiff here.

18            Defendants argue, however, that these protections are

19    inapplicable to plaintiff because an order from the Center of

20    Disease Control regarding COVID-19, which is derived from

21    statutory authority contained in 42 U.S. Code § 265, permits

22    the return of individuals in circumstances similar to the ones

23    that the plaintiff is in and to include plaintiff.

24            In my view, the plaintiff is likely to succeed on the

25    question of whether 42 U.S.C. 265 grants the director of the

1    CDC the power the government articulates here for three related

2    reasons.  The first is that the statute authorizes the director

3    of the CDC to prohibit the introduction of persons and property

4    by its plain terms.  There's a serious question about whether

5    that power includes the power also to remove or exclude persons

6    who are already present in the United States.  There are other

7    provisions, obviously, in the immigration statutes that

8    reference the power to return or to remove.  The fact that

9    Congress did not use those terms here, I think, is -- suggests

10   at a minimum that the power to remove is not granted by section

11   265.

12        Even if the power to remove were read by section 265,

13   the plaintiff has likelihood of success because the provision,

14   in the Court's view, should be harmonized, to the maximum

15   extent possible, with immigration statutes, including those

16   already referenced that grant special protections to minors and

17   also those immigration statutes that deal with communicable

18   diseases and quarantines.

19        Because the Court concludes that the plaintiff has a

20   likelihood of success on whether -- I apologize.  The Court, in

21   addition, does not believe that the CDC director is likely

22   entitled to *Chevron* deference; whereas, here the provision at

23   issue, 42 U.S. Code 265, needs to also be read in light of

24   statutes that the CDC director quite plainly has no special

25   expertise regarding, and also whereas, here the order does very

1    little by way of an analysis of what exactly the power to

2    prohibit the introduction of persons and property means.

3          Having concluded that the plaintiff is likely to succeed

4    on the argument that the CDC director does not have this power

5    under 42 U.S.C. 265, the Court need not reach the question of

6    whether the CDC's order is otherwise arbitrary and capricious.

7    Although the Court does find that the government's arguments

8    regarding the current pandemic steps that would be appropriate

9    to ensure the -- the reduced communication of the disease and

10   similar questions are well founded and if the Court were to

11   reach the arbitrary and capricious question, the Court would

12   likely conclude that the order is not arbitrary and capricious.

13   But for the reasons stated, the Court need not reach that

14   question.

15         As to the balance of harms, the plaintiff has submitted

16   under seal a declaration describing the possible harms that

17   would result from plaintiff's return to Honduras.  It is

18   certainly the case that plaintiff has not established that

19   those harms are certain to occur, but there is at a minimum the

20   risk that those harms, which are specified in some detail,

21   could occur.  And so the Court concludes that the plaintiff has

22   established -- the plaintiff has established the -- that he is

23   likely to suffer irreparable harm in the absence of an order

24   here.

25         On the other side of the ledger, as the parties note,

1    the third and fourth factors for preliminary injunctive relief

2    when the government is the defendant merge, and while there is,

3    of course, a general concern about the transmission of COVID-19

4    that the Court, of course, recognizes, as noted earlier, this

5    is a -- and as the plaintiff has stressed, this is a single

6    plaintiff case where the plaintiff has, so far as the Court is

7    aware -- there appears to be no evidence to the contrary.  The

8    plaintiff has -- does not have COVID-19 and has no symptoms of

9    COVID-19 and at this point was apprehended well more than 15

10   days ago.  So to the extent that he may have had COVID-19, any

11   potential harm, it seems to the Court, would have occurred

12   already from his presence in the United States.  And at least

13   that kind of harm would not be remedied by his return; that is,

14   to say, the transmission by him of COVID-19.

15        And, more generally, while the Court, of course,

16   understands that the government has an interest in

17   administering in the immigration context the system and the

18   rules relevant to reducing transmission of COVID-19, the Court

19   concludes that in the context of this matter, that the balance

20   of harms tips in the plaintiff's favor in light of the showing

21   he has made under seal of the possibility of harm to him upon

22   return, balanced against the fairly reduced or, if any, showing

23   of harm by the government from his continued nonremoval.

24        Having said all of that, the Court does not intend for

25   this order to extend indefinitely.  I do believe that the most

1    appropriate procedural mechanism here is to, for the reasons

2    stated, keep the plaintiff in the United States -- or at least

3    not to have him removed to Honduras or Mexico -- but to resolve

4    fully and finally this case on the merits on an expedited basis

5    so that he can either be removed, as the government argues, or

6    can continue to stay in the United States, as plaintiff will,

7    of course, urge.

8        So with that, I intend to get an order out today

9    delineating just the basics of the order.  That is to say, that

10   plaintiff is -- shall not be returned to his home country or

11   removed from the United States until resolution of this case on

12   the merits and ordering the parties to meet and confer and

13   propose summary judgment briefing.

14       But do the parties have questions about my rulings,

15   which, of course, I'm doing as quickly as possible in part

16   because I believe that was at least implied by the government's

17   consent to not remove the plaintiff before today.  But if there

18   are any ambiguities or questions the parties would like to ask,

19   please do so.

20       I'll start with plaintiff's counsel, Mr. Gelernt.

21       MR. GELERNT:  Nothing from us, Your Honor.

22       THE COURT:  Ms. Lin.

23       MS. LIN:  Nothing from the government, Your Honor.

24       THE COURT:  Okay.  So you will see hopefully an order

25   from me today, and -- and, again, I will stress that I would

1    like the merits briefing to move quickly.  Obviously we have to

2    wait on the administrative record, to some extent, but I hope

3    to receive from the parties in relatively quick fashion the --

4    either the joint proposal or the competing proposals for

5    further briefing schedule.  So thank you all.  Have a nice rest

6    of your day.

7              (The proceedings concluded at 11:38 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                    Dated this 24th day of June, 2020.

10

11                    /s/ Nancy J. Meyer                
                       Nancy J. Meyer
12                    Official Court Reporter
                       Registered Diplomate Reporter
13                    Certified Realtime Reporter
                       333 Constitution Avenue Northwest, Room 6509
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25